EASTERLY, Associate Judge:
This case requires us to interpret the Procurement Practices Reform Act of 2010 (the “PPRA”), D.C.Code § 2-351.01 et seq., legislation which the Council of the District of Columbia passed to promote competition, fairness, and public confidence in the District government’s contracting process. Specifically, we consider the work an agency must do before including limiting specifications in a request for proposals (“RFP”) and, relatedly, the role that the statutorily created Contract Appeals Board (“Board”) must play in reviewing pre-award protests to RFPs to ensure that limiting specifications are justified under the PPRA and corresponding-regulations.
The RFP in question sought proposals for a contract to produce driver’s licenses for issuance by the District of Columbia’s Department of Motor Vehicles (“DMV”). MorphoTrust USA, Inc. (“MorphoTrust”) filed a protest with the Board, asserting that a number of the specifications in the RFP were overly restrictive and needlessly chilled competition. After the Board denied the protest and the Superior Court *574 affirmed the Board, MorphoTrust filed this appeal. MorphoTrust argues that the Board improperly deferred to the judgments of the DMV regarding the challenged specifications, failed to resolve important disputed facts, and made findings that were unsupported by the record.
We agree that the Board’s review of MorphoTrust’s protest to the DMV’s RFP was inadequate, and neither complied with the PPRA’s text and its corresponding regulations nor fulfilled their goals. Particularly at the initial stage of the procurement process, when the issue is who will be eligible even to submit a proposal, the Board may not defer broadly to agency decision-making. Rather, the Board has a duty to assess “de novo” — the statutory term — whether challenged specifications that limit competition only do so because they reflect the District’s stated minimum needs. We question whether the information currently in the record would have permitted the Board to make such a de novo determination, but the point is that this determination is the Board’s to make in the first instance. Accordingly, we reverse the order of the Superior Court and remand for proceedings not inconsistent with this opinion.
I. Overview of the Relevant Procurement Law and Regulations
The procurement of goods and services by the District of Columbia government is generally governed by the PPRA and corresponding regulations.[1] Among the Act’s central purposes are “foster[ing] effective and equitably broad-based competition in the District,” “obtain[ing] full and open competition by providing that contractors are given adequate opportunities to bid,” and “increasing] public confidence in the procedures followed in public procurement.”[2] The Act itself provides that it shall be “liberally construed and applied to promote its underlying purposes and policies.” [3]
One means by which a District agency may procure goods and services under the PPRA is through a request for “competitive sealed proposals,” which are solicited by the Office of Contracting and Procurement on the. agency’s behalf.[4] Consistent with the statute’s general focus on fostering competition, such proposals must be “solicited from the maximum number of qualified sources.”[5]
*575 The District’s procurement regulations specify steps that agencies must take to ensure “full and open competition”[6] from the outset of the solicitation. An agency with a need for a particular good or service must first, before it actually drafts an RFP, “perform procurement planning and conduct market surveys,”[7] gathering information about the “entire available market.”[8] The agency must then use this market research to “develop [the] specifications and purchase descriptions” to be included in the RFP, “in a manner designed to promote competition to the maximum extent possible, with due regard to the nature of the goods or services to be procured.”[9] Any specifications that the agency ultimately decides to include in its RFP “shall state only the District’s actual minimum needs,”[10] must “reflect ... the market available to meet those needs,”[11] and may include “restrictive provisions and conditions only to the extent necessary to satisfy the minimum needs of the District, or as authorized or required by law.”[12]
If a prospective offeror believes that an agency has failed to adhere to the above-described statutory and regulatory provisions promoting competition, and wishes to challenge the specifications of an RFP as unduly restrictive, the PPRA directs the offeror to seek relief from the Contract Appeals Board.[13] The Board is an independent, neutral, executive-branch entity, comprised of administrative law judges who are licensed attorneys with, inter alia, “no less than 5 years experience in public contract law.”[14]
The PPRA authorizes the Board, after hearing from both the protestor and the District,[15] to resolve disputed issues of fact.[16] The PPRA also directs that “the *576 Board shall decide whether the solicitation ... was in accordance with the applicable law, rules, and terms and conditions of the solicitation.”[17] The statute provides that the Board’s review “shall be de novo,” and “[a]ny prior determinations by administrative officials shall not be final or conclusive.” [18] If the Board sustains the protest, it has broad remedial power, including the power to order the District to terminate any contract awarded under the challenged solicitation and to issue a new RFP.[19]
II. Facts and Procedural History
In 2012, the Office of Contracting and Procurement issued an RFP on behalf of the DMV, RFP No. Doc62682, for a “Centralized Security Credentialing System” to produce driver’s licenses and ID cards equipped with “the most secure credentialing features.” In order to “improve and increase card security to deter fraud and deter attempts to illegally duplicate identity credentials,” the RFP called for the system to “use the latest technology” and to manufacture cards that would “be tamper proof to the highest extent possible.”
The RFP set forth numerous specifications. Particularly with respect to the driver’s licenses that would be manufactured under the contract, the RFP listed seventeen particular features that would, “at minimum,” be required, including a solid polycarbonate card base and four laser-engraved details.[20] In addition, the RFP listed particular security requirements for the facility where the cards would be manufactured, among them “outside security to include fences, distance from entrance to parking[,] etc.” The District made clear that these specifications were nonnegotiable.[21]
Before a contract was awarded, Morpho-Trust filed a formal protest with the Board, challenging the specifications of a solid polycarbonate card base, the four laser-engraved details, and outdoor fencing.[22] MorphoTrust produces driver’s li *577 censes and ID cards for 41 states and, prior to this litigation,- the District of Columbia. MorphoTrust’s ID cards, however, are made from Teslin, as opposed to polycarbonate, and they are not laser-engraved.[23] MorphoTrust’s production facility is also not secured by outdoor fencing. MorphoTrust asserted that the challenged specifications in the RFP far exceeded the “actual minimum needs of the District” for secure digitized driver’s licenses and facility security, and that they were therefore unduly restrictive, improperly narrowed competition, and violated the District’s procurement regulations. MorphoTrust further claimed its Teslin cards were just as durable and tamper-proof as laser-engraved cards made from polycarbonate, and its production facilities had security comparable (if not superior) to outdoor fencing. MorphoTrust asked the Board to recommend that the District amend the RFP and eliminate these requirements.
In response to MorphoTrust’s protest, the District filed an Agency Report, defending the contents of the RFP. Repeatedly asserting without explanation the District’s “singular security needs” as the nation’s capital, the District argued that the “DMV [had] established a minimum need for the most secure credentials possible.”
The District preliminarily claimed that “DMV experts” had “engaged in an extensive three-year market study to develop specifications that met the need.” To support this latter assertion, the District cited to a single-page declaration submitted by DMV’s Chief Information Officer, Mr. Amit Vora. Mr. Vora’s declaration in turn adopted as “accurate” a four-page, undated, anonymous “summary of steps taken by the Department of Motor Vehicles to Develop Secure Credentialing RFP” (“summary attachment”).
The undated, anonymous summary attachment briefly addressed the actions taken by the DMV prior to issuing the RFP. It stated that unidentified individuals at unidentified times had “[a]ttend[ed] [c]onferences and researched] new technology and trends surrounding secure identification cards,” but did not state what the DMV had learned. The summary stated that “DMV also gathered information by visiting and contacting the Department of Motor Vehicles in other jurisdictions,” but likewise failed to detail any information the DMV had acquired.[24] The summary also listed “[r]ecent network opportunities that the Director of DMV and DMV’s Driver’s Services have attended for the past three years,” but it did not identify with whom the DMV had “networked”; nor did it explain how these efforts related to its ultimate decision to include the challenged specifications in the RFP.
This was the “market research” on which the District relied in the Agency Report when it asserted that the “DMV [had] justified the minimum need for a polycarbonate card.”[25] Specifically, the *578 District claimed that “[i]n the Declaration of Amit Vora, DMV set forth the reasons why no other material has the security of polycarbonate.” In fact, the Vora Declaration said nothing about the minimum need for a polycarbonate card and the District’s citation was to the summary attachment to the Vora Declaration. The summary attachment in turn did not explain why “no other material” would suffice.. It contained no mention of potential alternatives to polycarbonate. It simply provided a description of the features of polycarbonate cards, repeating almost verbatim— but without attribution — portions of a 2008 marketing brochure of a polycarbonate manufacturer, Gemalto.[26] The summary attachment and the Agency report specifically touted the fact that polycarbonate cards are non-delaminable (i.e., the layers of the card are fused together and cannot be peeled apart), and thus tamper-proof, and that the card “has over a ten year durability.”
The District also asserted that the DMV had “justified the minimum need for additional facility security.” The District asserted that, given the sensitivity of the information gathered from individuals seeking identification, the offeror needed to have a production facility “at least as secure as the District’s own DMV facilities.” The District did not detail DMVs security features, but it asserted that they met the “standards of the American Society of Industrial Security (‘ASIS’).” The District claimed that the security specifications were likewise prepared in accordance with ASIS standards, but it supplied no supporting documentation for this assertion, not even the standards themselves. The District did, however, list in the Agency Report a number of the standards it represented as ASIS standards; none of these mentioned fencing.[27]
Following submission of the Agency Report, MorphoTrust filed Comments on the Agency Report in which it observed that the District had failed to provide a credible justification for the challenged specifications. Asserting that the District had “confused” its minimum needs with “design preferences,” MorphoTrust argued that the District had failed to rebut Mor-phoTrust’s evidence that its cards and production facility would fully satisfy the District’s security needs at a better price. More particularly, MorphoTrust argued that it had presented evidence that there was “no consensus among the states on whether polycarbonate or another material are more secure or durable,” and it argued that certain features of a polycarbonate card, including laser-engraving (which the Agency Report made no attempt to defend as a specification), “do not automatically make it a more secure card.”[28] On the *579 issue of the use of fencing to ensure security of an offeror’s production facility, MorphoTrust similarly argued that the fencing requirement was not compelled by any industry standards that the District purported to follow and that the District had not shown that its DMV facilities were protected by fencing, even as it had claimed that it needed the offeror’s facility to be as secure as DMV facilities.
In response, the District moved for and received leave to file a Reply along with additional exhibits. The exhibits were submitted to buttress the District’s selection of polycarbonate as the material from which an offeror must make identification cards,[29] but the District made no representation that anyone had consulted these documents or was aware of the information contained therein prior to the issuance of the RFP. The Reply, like the Agency Report, did not separately defend the four laser-engraved details and did not respond to MorphoTrust’s challenge to the agency’s fencing requirement.
In a brief order that was long on background facts and recitation of the parties’ arguments, and short on analysis of the merits, the Board denied MorphoTrust’s protest. It preliminarily accepted without question the District’s assertion that it had undertaken three years of market research before selecting the specifications for the manufacture of the identification card. Then, without any acknowledgement of disputes of fact, much less any fact-finding, the Board “deferred” to the District’s assessment that the challenged specifications reflected its minimum needs. The Board thus concluded that MorphoTrust had failed to carry what the Board understood to be the challenger’s “heavy burden” to show that the challenged specifications were “unreasonable.”
MorphoTrust unsuccessfully sought to overturn the Board’s decision in the Superior Court of the District of Columbia, arguing that the Board had employed the wrong standard of review and substantive standard in evaluating its protest, that the Board’s decision lacked substantial support in the agency record, and that the decision was clearly erroneous as a matter of law. This appeal followed.
III. This Court’s Jurisdiction and Standard of Review
Before we identify our standard of review, we must first clarify our jurisdiction.[30] This case comes to us from the *580 Superior Court, where MorphoTrust sought review of the Board’s decision denying its pre-award protest of the DMV’s RFP.[31] We have jurisdiction to review a Superior Court order only so long as the Superior Court had jurisdiction to issue it.[32]
Nothing in the PPRA directed MorphoTrust to proceed first to Superior Court, but our cases interpreting the predecessor procurement statute and its regulations have required protesting parties to seek relief in the first instance in Superior Court. See, e.g., Abadie v. District of Columbia Contract Appeals Bd., 916 A.2d 913, 918 (D.C.2007); Jones & Artis Const. Co. v. District of Columbia Contract Appeals Bd., 549 A.2d 315, 317-18 (D.C.1988). Reviewing the predecessor statute in Jones & Artis, we concluded that protests were not “contested cases” within the meaning of the D.C. Administrative Procedure Act (“DCAPA”) and therefore were properly routed through Superior Court before we could review them. See Jones & Artis, 549 A2d at 317-18, Our analysis turned on both the absence of statutory language indicating that protest proceedings required a hearing,[33] as well as the failure of the Board to adopt any “regulations whatsoever ... that would suggest the Board might use a trial-type hearing to resolve a protest.” Id. at 317. We distinguished the absence of such provisions for “protests” from the provisions addressing contractor appeals, which provided for “hearings,” “oaths, discovery, and subpoena power.” See id.
In 2002, however, the Board enacted regulations that allow it to use a trial-type hearing to resolve a protest.[34] Following the analysis of Jones & Artis, one might conclude that bid protests litigated pursuant to these regulations are, in fact, “contested cases.” Nevertheless, this court has continued to hold that protests are not contested within the meaning of DCAPA. See Abadie, 916 A.2d at 918 (citing Jones & Artis). See also Eagle Maint. Servs., Inc. v. District of Columbia Contract Appeals Bd., 893 A.2d 569, 572 n. 1 (D.C. *581 2006). As we see no means of distinguishing this prior precedent,[35] we conclude it was proper for MorphoTrust to petition the Superior Court for review before appealing to this court.
We review the “Superior Court’s affirmance of the [Board’s] decision in the same manner as if the ruling came to us directly from the agency.” Abadie, 916 A.2d at 918 (internal quotation marks omitted). “In other words, ‘it is the decision of the [Board] that this court reviews.’ ” Id. at 918 (quoting Eagle Maint. Servs., 893 A.2d at 572 n. 1). In so doing, we accept the Board’s decisions on questions of fact as “final and conclusive” unless they are “arbitrary, capricious, fraudulent, or clearly erroneous.” D.C.Code § 2-360.08(e).[36] We review questions of law de novo, however, and our de novo review encompasses issues of statutory construction, on which “the judiciary is the final authority.” Abadie v. District of Columbia Contract Appeals Bd., 843 A.2d 738, 741 (D.C.2004). See also Abadie, 916 A.2d at 919; Eagle Maint. Servs., 893 A.2d at 576.[37]
IV. Analysis
MorphoTrust argues that the Board erred as a matter of law in reviewing its pre-award protest by deferring to the DMV’s decisions in drafting the RFP and considering only whether the limiting specifications therein were “reasonably related” to the District’s minimum needs. We agree that the Board appeared to misunderstand its role as defined by the PPRA and corresponding regulations, and thus failed to review MorphoTrust’s protest ■with the requisite rigor.
A. Clarifying the Board’s Function
We turn first to the standard of review that the Board is to employ in its analysis of pre-award protests. Relying exclusively on its own common law, i.e., a body of its own decisions dating back to the 1980s, the Board stated that it would “defer” to the agency’s determination of its needs and of the best methods of accommodating them, and assess only whether challenged specifications were “reasonably related to achieving the government’s actual minimum needs,” imposing on the protestor the “heavy burden” to prove otherwise. The Board’s understanding of its *582 standard of review as requiring broad deference in assessing reasonableness cannot be reconciled with it.s unambiguous statutory and regulatory obligations vis a vis protests of a solicitation or an award of a contract.
As discussed above, the PPRA identifies the promotion of competition as a central goal and confers upon the Board the ultimate authority and responsibility to “decide whether [a challenged] solicitation ... was in accordance with the applicable law.”[38] More to the point, the statute explicitly provides that the Board’s review “shall be de novo.”[39] The corresponding regulations reiterate that “[t]he Board shall hear and decide, de novo, all cases under its jurisdiction.”[40]
In legal parlance, “de novo” means “anew,” and to conduct a “de novo judicial review” means to conduct “a nondeferen-tial review” of a preceding decision.[41] The PPRA’s specification that the Board’s review be “de novo” aligns perfectly with the PPRA’s express directive that the Board’s determinations are controlling and that “[a]ny prior determinations by administrative officials shall not be final or conclusive.”[42] Looking beyond the provisions that plainly spell out the Board’s review obligations, we note that the PPRA establishes the Board as an entity outside and independent of the agency, comprised of a select group of attorneys with expertise in procurement law.[43] This institutional structure supports our conclusion that the Board exists to review agency decisions searchingly, not defer to them broadly unless they are deemed unreasonable.[44]
Unable to disregard the plain language of the PPRA and corresponding regulations, the District argues that the Board’s “de novo” review relates only to its ability to receive “new” evidence and is still “consistent with according deference to” a procuring agency. But this interpretation of “de novo,” as broadly deferential, cannot be squared with the commonly understood definition of de novo review discussed above. Nor are we persuaded by the District’s argument that “de novo” must have special meaning in the procurement context because federal agencies like the Government Accountability Office (“GAO”) and the General Services Agency Board of Contract Appeals (“GSBCA”) have employed a deferential standard of review. Where “District contracting practice parallels federal government contract law,” this court has obtained guidance from “rele *583 vant decisions of federal tribunals with ‘particular expertise in this area.’ ” Abadie, 916 A.2d at 919 (quoting Dano Res. Recovery, Inc. v. District of Columbia, 620 A.2d 1346, 1351 (D.C.1993)). But regarding standards of review, the PPRA does not resemble the federal law under which the GAO operates, or the GSBCA used to operate, because the latter does not specify that the standard of review of agency decision-making is de novo.[45] In light of these differences, we adhere to the plain language of our own law.
Alternatively, the District argues that because the PPRA does not “unambiguously forbid” the Board from employing a deferential standard of review, this court should defer to the Board’s “reasonable interpretation of the statute and rules it administers.” As our discussion has shown, however, the PPRA and its corresponding regulations do not countenance the essentially hands-off deference to “reasonable” RFP specifications that the District urges, but instead require the Board’s careful scrutiny of those terms for conformity to the agency’s minimum procurement needs as shaped by the pro-competition bent of the statute. In accordance with the Supreme Court’s decision in Chevron, U.S.A, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), before we afford some deference to an agency’s interpretation of the statute that it administers at least two conditions must be met: (1) the statutory language in question must be ambiguous, and (2) the agency’s interpretation must be reasonable. Id. at 842-43, 104 S.Ct. 2778; Timus v. District of Columbia Dep’t of Human Rights, 633 A.2d 751, 758 (D.C.1993) (en banc) (acknowledging the by now “familiar” two-part Chevron test and noting that “[t]his court employs the same analysis”). In our view, neither prerequisite has been satisfied in this case.[46]
*584 All of this is not to say that in exercising its review authority, the Board may give no recognition or weight to agency expertise reflected in an RFP’s articulation of minimum needs. Bid solicitations may involve (to borrow Supreme Court language from another context) “factual dispute[s], the resolution of which implicates substantial agency expertise,” sometimes “a high level of technical expertise,” Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 376-77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting in part Kleppe v. Sierra Club, 427 U.S. 87, 103 (1983)), and the Board need not turn a blind eye to such specialized knowledge embodied in particular RFP specifications. What remains indisputable, however, is the Board’s obligation to conduct a searching and careful evaluation of both the process the agency has followed in determining minimum needs and the evidence proffered to support its judgment of what its needs are.
*585 Having clarified the Board’s standard of review, we turn to the intimately connected issue of the substantive standard that the Board must employ when assessing a pre-solicitation protest of specifications within an RFP. To determine, as it must, if a District agency is following the law,[47] the Board must examine whether the challenged specifications “state only the District’s actual minimum needs”[48] and whether any “restrictive provisions” are “necessary to satisfy the minimum needs of the District.”[49]
We presume that an agency has the best understanding of what it requires in the way of goods and services. But to ensure that an agency does not develop tunnel vision or worse, the PPRA requires that an agency draft RFPs with an eye to maximizing competition. This means that if an agency wants to include a limiting specification in an RFP, the agency must be able to justify this specification as a minimum need. The agency may do so with the fruits of its pre-solicitation market research. It is the Board’s essential function to ensure that the agency has done its homework. Where a desired specification is highly restrictive or narrowly drawn, the agency’s market research must reflect some acknowledgement and actual comparison of the qualities of competing products as well as some sort of cost-benefit analysis. On the other hand, where a specification is set forth in more general terms, less detailed market research may be necessary to support its inclusion. There will be no formula for what level of record evidence is necessary to establish whether the RFP articulates the agency’s minimum needs; but the Board’s review in each case must reflect its duty to ensure that the RFP embodies the District’s “actual minimum needs.”[50] 27 DCMR § 2500.4.
Here, the Board seemed to think that its obligation was only to undertake a free-floating “reasonableness” assessment of the challenged specifications, and that MorphoTrust, as protestor, bore the “heavy burden of demonstrating by a preponderance of the evidence that the agency has impermissibly narrowed competition,” which, according to the Board “in other words” meant that the protestor had to show that the challenged restrictions were “unreasonable.” These observations are part and parcel of the Board’s erroneous understanding of its review authority as broadly deferential to the agency. Indeed, just as there is nothing in the PPRA that authorizes such self-abnegatory deference to the agency in resolving" a presolicitation protest of an RFP, the PPRA and its corresponding regulations nowhere *586 direct the Board merely to confirm that a challenged specification is not unreasonable.[51]
We stress that we are clarifying the Board’s reviewing authority (and responsibility) in the early stages of the procurement, when the agency is best positioned to structure an impending procurement either to promote or stifle competition. Although the Board’s standard of review is at every stage de novo, as a procurement moves forward, more agency discretion is built into the process. For example, once a bid has opened, the Board may accept agency judgments incorporated into the initial solicitation because challenges to the contents of a solicitation are prohibited after bid opening.[52] Similarly, the fact that the Chief Procurement Officer (presumably with the input of the agency) may select the proposal that is “advantageous to the District” builds in some measure of discretion, particularly when technical expertise has come into play.[53] But at the outset of the procurement process, when the District seeks goods by means of “competitive sealed proposals,” the Board must confirm, de novo, that challenged specifications reflect the District’s minimum needs.
B. The Board’s Resolution of Mor-phoTrust’s Protest
Having thus clarified the Board’s role and reviewing obligations, we conclude that the Board’s resolution of Morpho-Trust’s protest was inadequate.

1. Card Specifications

We first examine the Board’s assessment of the challenged card specifications: That the card be made of polycarbonate and, relatedly, that it have at least four specific laser-engraved features. The Board stated that “the District is allowed to determine at the outset which security card features will best meet its minimum needs” and that the District “may specify certain required specifications as long as they are reasonable.” As explained above, however, it was the Board’s obligation to determine whether the challenged card specifications in fact reflected the District’s minimum needs, even allowing for the specialized knowledge DMV may bring to bear on the issues.
The Board’s first critical misstep was to conclude that the District had undertaken “the requisite market research to determine that this particular type of secure card” reflected the District’s minimum needs. At least based on the information *587 provided by the District, the Board had no foundation for this determination. The record reflects little more than that, prior to drafting the RFP at issue, the DMV gathered some product information, i.e., it took some action to educate itself about polycarbonate cards and laser engraving, but even the details of this effort were murky. References were made to conferences attended, contacts made with other jurisdictions, and “networking,” but zero detail was provided about what the DMV had learned. It is unclear when the DMV acquired the information about polycarbonate contained in the summary attachment, or when it came by the 2008 Gemal-to marketing brochure or the Jan Kremer & Associates white paper, or whether it possessed any of this information when it drafted the RFP. But assuming it did, gathering product information is not the same thing as “market research.” Market research requires an assessment of the “entire available market.” See supra note 8 (citing 27 DCMR § 2599.1). In this case, one might reasonably expect market research to include materials from competitor producers of polycarbonate cards and non-polycarbonate cards, a survey of materials used by other' states or government entities for their identification cards, a eost/benefit analysis of using different materials, or any other material that would support the conclusion that the DMV, selecting from a menu of known options, made an informed decision that it was necessary to manufacture the District’s identification cards from polycarbonate as opposed to other materials.
Without true market research, the Board had no basis to evaluate, much less accept, the District’s conclusory assertion (1) that polycarbonate cards with laser engraving are the “gold standard,” or (2) even assuming such cards enjoy specific features superior to other materials (e.g., nondelaminability or durability), that these features should be controlling when others might also meet the District’s minimal needs.[54] This was a problem, particularly where MorphoTrust argued (and presented evidence to support its argument) that its product was comparable in quality and more affordable. See supra note 28.[55] It was the Board’s job to evaluate the evidence presented by the parties, make findings to resolve the factual disputes raised, and, while giving due regard to the DMV’s technical expertise, ultimately to determine if MorphoTrust had proved by a preponderance of the evidence that a laser-engraved polycarbonate card did not reflect the District’s minimum needs. This-court’s function in this appeal, in turn, is not to prejudge the answer to that question. The defect we identify is the Board’s failure to conduct the necessary comprehensive evaluation of the RFP, one that it must rectify on remand.

2. Fencing

We likewise determine that the Board’s review of the fencing requirement in the RFP was inadequate. The Board *588 concluded that this requirement was “reasonable particularly because the manufacturing facilities will contain confidential information and the District may rationally require the same level of security at the proposed manufacturing facility as exists currently at its DMV facilities.” Once again, the question before the Board was not whether the DMV’s decision was “rational,” or reasonable, but whether the decision to include a fencing requirement reflected a minimum need — i.e., whether there was no other equally effective methods to assure security. And once again, there were factual issues that the Board never considered or resolved. Morpho-Trust challenged the assertions in the Agency Report that the DMV used fencing at all its facilities and that industry standards required outdoor fencing. (Although the District filed a Reply with the Board, it never responded to Morpho-Trust’s arguments.) It was error for the Board simply to accept the District’s unsubstantiated representations that fencing was a necessary security feature. Rather, it was the Board’s job to evaluate the evidence proffered, require any testimony or additional documentary proof it deemed necessary, and determine whether DMV properly or improperly included fencing as a limiting specification in the RFP.
As detailed above, the Board did not fulfill its statutory and regulatory obligations (1) to review the challenged specifications in the DMV’s RFP de novo, (2) to assess the market research and other materials proffered as evidence by the parties and resolve any disputes of fact, and (3) in this manner, to determine if the challenged specifications reflected the agency’s minimum needs and thus were justified under the statute. We therefore reverse the order of the Superior Court, with orders to vacate the opinion of the Board and remand for proceedings-not inconsistent with this opinion.[56]

So ordered.

Concurring opinion by Senior Judge FARRELL at page 588.
Dissenting opinion by Associate Judge BLACKBURNE-RIGSBY at page 589.

.See 27 DCMR § 100 et seq. Notably, the bulk of these regulations were promulgated in connection with the D.C. Procurement Practices Act of 1985 ("the PPA”), which was repealed when the PPRA became law. The PPRA provides, however, that "existing procurement rules, to the degree they are consistent with this chapter, shall remain in effect until they are superseded by rules issued in accordance with subsection (a) of this section" which authorizes the Chief Procurement Officer "to issue rules.” D.C.Code § 2-361.06(b) (2012 Repl.). Both the Board and the Office of Contracting and Procurement identify these regulations on their respective websites as the regulations currently in force. The District has never argued that these regulations are defunct and instead has relied on these regulations throughout this litigation; we will do the same.

. D.C.Code § 2-351.01 (b)(2), (3), (5)' (2012 Repl.).

. D.C.Code § 2-351.01(a).

. See D.C.Code § 2-354.03 (2012 Repl.). The agency itself develops the RFP's contents, including a "statement of work or other description of the District’s specific needs"; the Office of Contracting and Procurement then publicizes the RFP and receives the proposals. Id. at § 2-354.03(d), (e).

. D.C.Code § 2-354.03(b) (2012 Repl.); 27 DCMR § 1600.1, -.2 (2013). See 27 DCMR § 2500.1 (1988) ("The District shall specify procurement needs in a manner designed to promote competition to the maximum extent possible.”).

. 27 DCMR§ 1009.1 (2011).

. Id..; see id. at § 1009.4 ("Procurement planning shall begin as soon as an agency need is identified and preferably well in advance of the fiscal year in which the contract award is necessary.”).

. 27 DCMR § 2599.1 (1988) (defining "market research” as "the process used for collecting and analyzing information about the entire available market that will satisfy the minimum agency need[,] used to arrive at the most suitable approach for acquiring, distributing, and supporting goods and services”).

. 27 DCMR § 2500.2 (1988) ("The District shall develop specifications and purchase descriptions using market research in a manner designed to promote competition to the maximum extent possible, with due regard to the nature of the goods or services to be procured.”); see supra note 8.

. 27 DCMR § 2500.4.

. Id. at § 2500.5.

. Id. at § 2500.3.

. See D.C.Code § 2-360.03(a) (2012 Repl.) (designating the Board as the "exclusive hearing tribunal for ... [a]ny protest of a solicitation”); 27 DCMR § 3800.1 (2012) ("[A]ll protests shall be filed with the District of Columbia Contract Appeals Board in accordance with the CAB's rules. The CAB has original jurisdiction to decide all protests of solicitations or awards.”).

. D.C.Code §§ 2~360.01(a)(2); -360.02 (2012 Repl).

. After a protest is submitted to the Board, the agency must submit a report which includes the agency's "position and defense for each ground of the protest, including facts, legal principles, and precedents supporting its position.” 27 DCMR § 305.1(e) (2002).

. See D.C.Code § 2-360.08(e) (2012 Repl.) (“A determination of an issue of fact by the Board under subsection (d) of this section shall be final and conclusive unless arbitrary, capricious, fraudulent, or clearly erroneous.”). See also 27 DCMR § 120.1 (2002) (specifying that "[e]xcept as otherwise provided by law, the burden of persuasion by a party to establish a fact or facts in dispute shall be met by a preponderance of the evidence”); 27 DCMR § 307.4 (2002) (discussing when the Board may treat facts as con *576 ceded); 27 DCMR § 311.1 (2002) (“If the Board determines that there is a genuine issue of material fact which cannot be resolved on the written record, the Board may order an evidentiary hearing.”).

. D.C.Code § 2-360.08(d).

. Id.; see D.C.Code § 2-360.03(a) ("The Board shall be the exclusive hearing tribunal for, and shall review and determine de novo ... [a]ny protest of a solicitation.”); 27 DCMR § 101.7 (2002) (“The Board shall hear and decide, de novo, all cases under its jurisdiction.”).

. D.C.Code § 2-360.08(f) (authorizing the Board, when it sustains a protest, to terminate any contract awarded under the solicitation or to grant any “other relief” as it deems appropriate); 27 DCMR § 314.1(d) (2002) (listing remedies available to the Board, including ordering the contracting agency to "[ijssue a new solicitation”).

. The laser-engraved features required by the RFP were: (1) a primary photo, (2) a clear tactile feature, (3) a tactile data feature, and (4) a ghost window with image.

. After the Office of Contracting and Procurement issued the RFP, the District responded to questions from potential offerors and made some minor amendments to the RFP based on those questions. Among these questions, the District was asked whether it would consider proposals that did not comply with one or more of the specifications, and, specifically, whether it would "consider and award on a proposal of a non-polycarbonate card construction.” The District responded that “[o]fferors are welcome to provide other options. However, the District will only evaluate the primary (required) proposal.”

. MorphoTrust also asserted that the RFP was improperly tailored to reflect the specifications of a card produced for the Commonwealth of Virginia by a competitor company, CBN-STI, and was likely to result in a sole-source procurement. MorphoTrust has not pursued this claim on appeal.

. Laser engraving is only possible on a polycarbonate card base.

. Indeed, there was some indication that the DMV had been unable to provide more detail, given its explanation that “many of our network and research opportunities for a more secure credential occurred several years ago as we have been planning for some time now to implement a new secured credential.” The DMV identified only "some of the states/territories we visited,” which included "AL, DE, MD, NY, VA, WVA, [and] Ottawa, CN.’ ” The District did not submit to the Board any notes, records, or memoranda documenting these visits.

.The District made no argument in the Agency Report in support of the four laser-engraved features challenged by Morpho-Trust; it simply noted that laser-engraving was a concomitant feature of a polycarbonate *578 card. The summary attachment to the Vora Declaration similarly noted that laser-engraving can only be done on polycarbonate cards and asserted that a "laser-engraved ghost window is a security feature that cannot be duplicated."

.The District attached this brochure (entitled a "white paper” on "Polycarbonate and Identity Documents”) as an exhibit to the Agency Report even though neither Mr. Vora, nor anyone else from the DMV, acknowledged reviewing it prior to drafting the specifications of the RFP, much less relying on it in doing so.

. The same list (again with no mention of fencing) appears in the summary.attachment to Mr. Vora’s Declaration, but there the list is identified as security "features [that] are currently in place at all DMV facilities,” not as ASIS security standards. The District did not attach any additional evidence of the DMV facilities’ security features.

. For example, MorphoTrust argued that the fact that a polycarbonate card is non-delaminable was immaterial because efforts to separate the layers of a Teslin card would be "readily discernable,” making it equally tamper proof. MorphoTrust also proffered evi *579 dence that its Teslin cards were highly durable.
MorphoTrust further noted that Teslin cards had other security features that polycarbonate cards did not — among them, the ability to reproduce more life-like color photographs, which is not currently possible with laser engraving. On the subject of laser engraving, MorphoTrust, citing attached exhibits, argued that laser engraved ghost windows could be counterfeited and laser engraved clear tactile features were no better than dark tactile features (which need not be laser engraved).
Ultimately, MorphoTrust argued that what was important was "layering and integrating of a variety of security features on and within the ID card,” rather than "adherence to one or a few specific security factors.”

. These documents consisted of: another "white paper,” authored by Jan Kremer & Associates, a security consulting firm which MorphoTrust alleged had ties to Gemalto; a •document indicating that the European Union had selected polycarbonate for its identification cards; and a 2010 Government Accountability Office report criticizing the State Department for declining to follow a recommendation to use polycarbonate as the base for its passport cards without first performing a full assessment of polycarbonate's benefits.

. Although neither party has raised a jurisdictional challenge, this court has an independent obligation to consider the source of our jurisdiction where it is subject to question. See Nunnally v. District of Columbia Metro. Police Dep’t, 80 A.3d 1004, 1006 n. 4 (D.C. *580 2013) (citing Murphy v. McCloud, 650 A.2d 202, 203 n. 4 (D.C.1994)).

. Indicating some confusion about the proper route for seeking appellate relief, Morpho-Trust initially appealed directly to this court, but voluntarily dismissed its appeal upon "learning” that it was required to first make its case to Superior Court.

. Nunnally, 80 A.3d at 1006-10.

. Although the predecessor statute did not require a hearing to resolve a protest, it designated the Board as a "hearing tribunal for ... any protest of a solicitation.” D.C.Code § 1-1189.8 (1988) (repealed 2010). The PPRA contains the same "protest of a solicitation” language. D.C.Code § 2-360.08(a).

. See 27 DCMR § 311.1, 311.2 (permitting the Board to use an "evidentiary hearing,” including taking "testimony under oath” and "direct and cross-examination of witnesses,” to resolve "genuine issue[s] of material fact” that arise during a protest). At the same time, the Board promulgated regulations which “govern all proceedings in all cases,” including protests, see 27 DCMR § 100, and which envision trial-type proceedings. See, e.g., 27 DCMR § 110.7 (2002) (permitting the Board to order a hearing on a motion); 27 DCMR § 114 (2002) (authorizing the presiding judge to issue subpoenas to compel witnesses to appear at a hearing to testify); 27 DCMR § 112 (2002) ("Discovery”). These regulations additionally direct the parties to seek judicial review of the Board’s decision on a protest in Superior Court. 27 DCMR § 312.2 (2002). We do not consider § 312.2 dispositive of the jurisdictional question, however, because nothing in the PPRA authorizes the Office of Contracting and Procurement or the Board to override D.CAPA’s contested-case review in the event this court determines that protests are contested cases.

. See M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C.1971) (no division of this court will overrule a prior decision of this court).

. Both the District and MorphoTrust cited D.C.Code § 2-360.07 (2012 Repl.) to explain the standard of review this court should apply. By its terms, however, § 2-360.07 applies to appeals by contractors (i.e. persons who have already entered into a contract with the District, see D.C.Code § 2-351.04(17) (2012 Repl.)) who come directly to this court, pursuant to D.C.Code § 2-360.05 (2012 Repl.) (“Appeal of Board Decisions”). Section 2-360.07 (2012 Repl.) has no application to pre-solicitation protests like this one, which are governed by § 2-360.08 ("Protest procedures”).

. This court's decision in Urban Development Solutions, LLC v. District of Columbia, 992 A.2d 1255, 1266-67 (D.C.2010), does not compel more deferential review of the Board’s actions, as the District argues. Urban Development Solutions did not present an issue of statutory construction. Instead, the central issue in the case was whether the plaintiff had adduced sufficient evidence to substantiate its claims that the District had acted improperly in a bid selection process regarding surplus property (which is not overseen by the Board in any event, id. at 1259 n.' 3). Urban Development Solutions thus in no way undermines the proposition that, vis a vis all District agencies, this court is "presumed to have the greater expertise when an agency’s decision rests on a question of law and ... therefore remain[s] 'the final authority on issues of statutory construction.' ” E.C. v. RCM of Wash., Inc., 92 A.3d 305, 313 (D.C.2014).

. D.C.Code § 2-360.08(d).

. Id. See D.C.Code § 2-360.03(a) ("The Board shall be the exclusive hearing tribunal for, and shall review and determine de novo ... [a]ny protest of a solicitation.”); 27 DCMR § 101.7 (“The Board shall hear and decide, de novo, all cases under its jurisdiction.”).

. 27 DCMR § 101.7.

. Black’s Law Dictionary 112 (10th ed.2010). By contrast, "deferential review” is defined as authorizing relief "only when [the] earlier proceeding entailed an unreasonable application of clearly established law or clearly unreasonable determination of the facts.” Id. (defining "deferential review”).

. D.C.Code § 2-360.08(d).

. Among other things, the PPRA heightened the qualifications for Board members. See D.C.Code § 360.02(b); D.C. Council, Comm, on Gov’t Operations & the Environ., Report on Bill 18-610 at 19 (Oct. 21, 2010).

. The Board did state that it would "more closely scrutinize the agency's determination of its minimum needs,” if a protestor could "show that the specifications will result in a sole source award.” But not only do we fail to see any support in the PPRA for this more limited scrutiny, the concern of the PPRA and its corresponding regulations is plainly to maximize competition, not simply to ensure that there are at least two offerors.

. The GAO applies a different statutory scheme when it evaluates whether the terms of an RFP comply with the law: The federal statute and regulations do not specify the standard of review that the GAO must use, and, in any event, unlike the decisions of the Board, the GAO's recommendations are not binding. See 31 U.S.C. §§ 3552-54; 4 C.F.R. § 21.0 (2008); 4 C.F.R. § 21.9 (2005). See also Kingdomware Tech., Inc. v. United States, 754 F.3d 923, 929 (Fed.Cir.2014) ("Although agencies often follow GAO recommendations in bid protest decisions ... these recommendations are not binding on an agency.”).
Like the GAO, the GSBCA (which ceased to exist in 2007) operated under a distinct statutory scheme that did not define its standard of review as de novo. See 40 U.S.C. § 759 (1988). Although at one point in time the GSBCA described its standard of review as de novo, see e.g., Protest of Lanier Bus. Prods., GSBCA No. 7702-P, 1985 WL 16487 (Apr. 2, 1985), it later endorsed review merely for "reasonableness.” See, e.g., Protest of Computer Sciences Corp., GSBCA No. 11497-P, 1991 WL 286233 (Dec. 30, 1991). Similarly, although the Federal Circuit referred to the GSBCA’s standard of review as de novo in Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed.Cir.1994), it subsequently eschewed that standard and explained that the GSBCA’s "task on review is to determine if an agency's procurement decision is grounded in reason. Once the Board determines that the agency’s selection is so grounded, it then defers to the agency’s decision.” Widnall v. B3H Corp., 75 F.3d 1577, 1579 (Fed.Cir.1996).
The dissent relies heavily on GAO and GSBCA precedent to support its argument that the Board should "defer” to "reasonable” agency decision-making in procurement decisions, notwithstanding the “de novo” review directive of the PPRA; but the dissent seemingly fails to appreciate that the GAO's and GSBCA’s standard of review could be constructed (and altered) by those entities and the courts in the absence of an express statutory directive defining the standard of review, such as the standard contained in the PPRA.

. The dissent argues that it is "wholly unclear” what sort of review the Council of the District of Columbia intended the Board to exercise when it adopted a "de novo” review standard in the PPA and then reaffirmed that *584 standard in the PPRA. Dissent at 591-92. But we see no reason to question the Council’s understanding of this well-established term. “Where a legislature borrows terms of art in which are accumulated the legal tradition and meanings of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.” Dobyns v. United States, 30 A.3d 155, 159-60 (D.C.2011) (quoting 1618 Twenty-First St. Tenants’ Ass'n, Inc. v. Phillips Collection, 829 A.2d 201, 203 (D.C.2003)) (internal quotation marks omitted).
Even if we were to agree that there were some measure of ambiguity in the term "de novo” review, we see no foundation for reinterpreting that term to mean the opposite of its dictionary definition. The dissent asserts that such a foundation lies in the Council's Report on the PPRA. Dissent at 592. But there is no discussion of the Board’s standard. of review in the Council’s Report, nor is there anything that can fairly be interpreted to call into question the Council's intent to reaffirm that the Board must review agency procurement decisions “de novo,” as that term is commonly understood. To the contrary, the Council Report notes at the outset that the impetus for the PPRA was the recognition that there were “significant flaws in the procurement system,” flaws that were attributable not to particular deficits in the law then in place, the PPA, but rather to problems with its "implementation.” D.C. Council, Comm, on Gov’t Operations & the Environ., Report on Bill 18-610 at 3. The Council Report then elaborated that, according to a report by the 2006 Procurement and Contracting Reform Task Force,
[T]en years of experience under the PPA have shown that agencies are not cooperating [with the law] and do not make effective, efficient procurement a priority. The authors found that a substantial portion of [District procurements are] known to be in violation of procurement procedures, indicating a lack of controls to insure compliance with the procurement laws and regulations. The experts concluded that the problems were not with the procurement law, but rather with the application of rules and the culture of compliance: [T]here are no significant deficiencies in the District's procurement framework which would cause the procurement system, if its requirements were followed, to be dysfunctional. The critical problem ... is the failure to establish a culture of compliance and enforcement of controls that insure compliance with the existing procurement regulation system.
Id. at 6-7 (internal quotations omitted). Among the recommendations made were “developing a more robust system of acquisition planning,” increasing accessibility of procurement rules and regulations, and developing a more professional, better-trained workforce of procurement personnel. Id. at 7. See also id. at 8 (again noting the "failure to follow existing rules”); id. at 10 (discussing the need for more transparency and for “maintaining a written record of key decisions,” and "accessible protest procedures to challenge potential violations of the law.”). In light of these concerns and objectives, we are hardpressed to conclude that the Council intended "de novo review” to mean “deferential review.” Rather, one could readily infer that the Council retained the de novo review standard' from the PPA because, as that standard of review is generally understood, it advanced the stated goal of better implementation of the District’s procurement law.

. D.C.Code § 2-360.08(d).

. 27 DCMR § 2500.4.

. Id. at § 2500.3.

. The dissent expresses concern that this court is conferring on the Board policy-making authority to define an agency’s minimum needs. Dissent at 595-96. But we merely hold that when agencies identify their minimum needs, they must be able to justify them before the Board. The dissent also asserts that we must distinguish between what it sees as the Board’s obligation to “vigorously” enforce the "procedural protections” of the PPRA, such as the market research requirement, and the Board’s obligation to defer to an agency’s ultimate assessment, in an RFP, of its minimum needs. Dissent at 601. The dissent does not endeavor to explain how the Board vigorously enforced the market research requirement in this case. But in any event, if, as the dissent seemingly posits, the Board were constrained to defer to an agency that "reasonably” disregarded the results of such research, these procedural protections would have little force or effect.

.We also take issue with the Board’s explanation of the weight of the protestor’s burden. (Its allocation on the protestor, although not addressed in the statute, appears proper; it is the norm in litigation generally that a plain-tiffichallenger bears the burden to prove her case, and MorphoTrust concedes in its Reply that it bore the burden to prove that the DMV violated the PPRA by including the challenged limiting specifications.) The Board in this case correctly acknowledged that the protestor's burden was proof “by a preponderance” of the evidence. 27 DCMR § 120.1 (defining the "burden of proof” in all Board proceedings, and stating that "[e]xcept as otherwise provided by law, the burden of persuasion by a party to establish a fact or facts in dispute shall be met by a preponderance of the evidence”). But such a burden is not "heavy.” See In re E.D.R., 772 A.2d 1156, 1160 (D.C.2001) (holding that preponderance of the evidence is merely that which "shows that the fact sought to be proved is more probable than not” (internal quotation marks omitted)).

. See 27 DCMR § 302.2(a) (2002)

. See D.C.Code § 2-354.03(e), (g)(2); 27 DCMR § 1613.5 (2013) ("While the lowest price or lowest total cost ... may be an important or even a deciding factor in most source selections, the District may select the source whose proposal is more advantageous to the District in terms of technical merit and other factors.”).

. In the agency report, the District repeatedly and conclusorily referred to the District's "singular security needs as the nation's capital,” a catchphrase it repeats on appeal. But the District never explained what those "singular” needs are, and it is far from obvious to this court why the District’s security needs vis a vis driver's licenses and other non-driver identity cards are appreciably different from the needs of other states. On remand, the District will have to explain those security needs to the Board in a way it has not done so far.

. Indeed, the District concedes in its brief to this court that, as to the justification for the specification of polycarbonate, there was “evidence supporting both sides” before the Board.

. If the Board in fact determines that the DMV did not draft the RFP in accordance with the statutory and regulatory requirements, the Board is authorized not merely to recommend that the DMV redraft the RFP, as MorphoTrust requested in its initial protest, but to order it to do so. See 27 DCMR § 314.1(c), (d), (0 (setting forth the remedies that the Board may “order” a contracting agency to take following a successful protest, including “[i]ssu[ing] a new solicitation,” "[r]ecompet[ing] the contract,” and "[t]ak[ing] other such action ... as the Board may direct”). See also D.C.Code § 2-360.08(f) (permitting the Board to “order,” “[i]n addition to other relief,” that a contract be terminated if a protest is sustained).