*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 16-AA-815, 16-AA-817, and 16-AA-825

OFFICE OF THE PEOPLE'S COUNSEL,
DISTRICT OF COLUMBIA,
DC SOLAR UNITED NEIGHBORHOODS, and
PUBLIC CITIZEN, INC.,
PETITIONERS,

07/20/2017
FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

V.

PUBLIC SERVICE COMMISSION OF THE DISTRICT OF COLUMBIA,
RESPONDENT,

and

EXELON CORPORATION, ET AL., INTERVENORS.

On Petitions for Review of a Decision of the
Public Service Commission of the District of Columbia
(FC-1119-16)

(Argued May 2, 2017                                     Decided July 20, 2017)

*Scott H. Strauss*, with whom *Sandra Mattavous-Frye*, *Karen R. Sistrunk*, *Laurence C. Daniels*, *Peter J. Hopkins*, *Anjali G. Patel*, *Jason T. Gray*, and *Eli D. Eilbott* were on the brief, for petitioner Office of the People's Counsel.

*James C. McKay, Jr.*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for petitioner District of Columbia.

*David J. Arkush*, with whom *Scott L. Nelson* was on the brief, for petitioners DC Solar United Neighborhoods and Public Citizen, Inc.

*Richard S. Herskovitz*, with whom *Christopher G. Lipscombe*, *Craig W. Berry*, and *Naza N. Shelley* were on the brief, for respondent Public Service Commission of the District of Columbia.

*David W. DeBruin*, with whom *Peter E. Meier*, *Matthew E. Price*, and *Zachary C. Schauf* were on the brief, for intervenors Exelon Corporation, et al.

Before FISHER and MCLEESE, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court by *Associate Judge* MCLEESE.

Concurring opinion by *Senior Judge* FARRELL at page 25.

MCLEESE, *Associate Judge*:  The Public Service Commission of the District of Columbia approved a merger application involving intervenor Exelon Corporation's purchase of Pepco Holdings, Inc. and its subsidiary, the Potomac Electric Power Company (Pepco).  Petitioners, the Office of the People's Counsel (OPC), the District of Columbia Government, and DC Solar United Neighborhoods jointly with Public Citizen, Inc. (collectively DC SUN), seek review of the Commission's decision.  Petitioners argue that the Commission made procedural errors, exceeded its statutory authority, approved merger terms that are contrary to law or unreasonable, did not clearly explain its reasoning, and failed to make an independent finding that the merger was in the public interest.  We affirm.

**I.**

In June 2014, Exelon, Pepco, and various related entities asked the Commission to approve a merger involving Exelon's purchase of Pepco Holdings, Inc. pursuant to D.C. Code §§ 34-504 (2012 Repl.) (prohibiting consolidation of public utilities unless Commission finds consolidation to be in public interest) and 34-1001 (2012 Repl.) (prohibiting purchase of stock of one public utility corporation by another public utility corporation absent approval by Commission). The Commission held four community hearings and eleven days of evidentiary hearings, and received extensive written testimony and comments regarding the application. In August 2015, the Commission concluded that the merger as proposed was not in the public interest.

In October 2015, applicants moved to reopen the record for the Commission to consider a Nonunanimous Settlement Agreement (NSA) executed by applicants, OPC, the District, and several other parties (together, the settling parties). The Commission agreed to consider the NSA and reopened the record for the limited purpose of determining whether the NSA was in the public interest. The Commission held five days of hearings and received written statements regarding the NSA. In February 2016, the Commission concluded that the NSA was not in

the public interest. Commissioner Fort concurred, but proposed a revised NSA (RNSA) that she believed would be in the public interest. Although Commissioner Phillips would have approved the NSA as in the public interest, he indicated that he would also approve the RNSA if the parties found it acceptable. The settling parties were instructed to file a notice with the Commission indicating whether they wished to accept the RNSA or instead to request further relief.

Applicants filed a request for other relief, asking that the Commission approve the merger in accordance with: (1) the terms outlined in the NSA; (2) the terms of the RNSA; or (3) the terms of a third "middle ground" proposal. Petitioners opposed applicants' request. In March 2016, the Commission approved the merger under the terms of the RNSA with one additional revision. The Commission denied petitioners' applications for reconsideration.

## II.

Our review of the Commission's orders is limited. D.C. Code § 34-606 (2012 Repl.). We will sustain the Commission's legal conclusions if they are "reasonable and based upon factors within the Commission's expertise." *District of Columbia v. District of Columbia Pub. Serv. Comm'n*, 905 A.2d 249, 256 n.22

(D.C. 2006) (internal quotation marks omitted). We accord great deference to the Commission's interpretation of the Public Utilities Act, *Office of People's Counsel v. Pub. Serv. Comm'n*, 477 A.2d 1093, 1098 (D.C. 1984), and we defer to the Commission's interpretation of its own regulations unless that interpretation is plainly erroneous, *Office of People's Counsel v. Pub. Serv. Comm'n*, 955 A.2d 169, 173 (D.C. 2008). The Commission's findings of fact are conclusive "unless it shall appear that such findings . . . are unreasonable, arbitrary, or capricious." D.C. Code § 34-606. "To permit meaningful judicial review, we require the [Commission] to explain its actions fully and clearly. If the [Commission] has done so, a petitioner challenging its decision . . . then must carry the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken." *District of Columbia v. District of Columbia Pub. Serv. Comm'n*, 905 A.2d at 256 n.22 (citation and internal quotation marks omitted). In sum, our review of the substance of the Commission's decisions is "the narrowest judicial review in the field of administrative law." *Wash. Gas Energy Servs. v. District of Columbia Pub. Serv. Comm'n*, 924 A.2d 296, 303 (D.C. 2007) (internal quotation marks omitted).

## III.

### A. Notice of NSA Hearings

On October 28, 2015, the Commission gave notice that it would hold a public-interest hearing on the merits of the NSA beginning on December 2, which was thirty-five days after issuance of that notice. The Commission further advised that it would hold a community hearing at a date and time to be announced. On November 5, the Commission issued an order giving twelve days' notice of the community hearing.

DC SUN argues that the Commission's notice of these hearings was inadequate. The parties dispute whether that objection, and several of petitioners' other objections, were properly raised before the Commission. Whether issues are properly raised before the Commission is generally not a jurisdictional issue. *Wash. Gas Light Co. v. Pub. Serv. Comm'n*, 982 A.2d 691, 699-708 (D.C. 2009). Because the Commission addressed the notice issue on the merits, and because we uphold the Commission's decision, we see no need to address the question whether the notice issue was properly raised before the Commission. For similar reasons,

we also decline to address whether a number of petitioners' other objections were adequately preserved.

In challenging the adequacy of the public notice of the hearings on the NSA, DC SUN first relies on D.C. Code § 34-909 (a) (2012 Repl.), which provides that:

> Notice of every rate application or change in condition of service proposed and filed with the Public Service Commission shall be given by the utility to each residential or commercial rate payer affected by the proposed rate application or change. . . . For every proceeding in which the Commission has a public hearing, the public shall be given a timely opportunity to present its views, as evidence of record, with at least 45 days['] notice, with notice widely and publicly distributed in a form sufficiently detailed and complete to permit the public to realize its specific and affected interest.

The Commission concluded that (1) this provision requires forty-five-day notice only in rate cases and cases involving changes in conditions of service, and (2) the present case is neither a rate case nor a case involving changes in conditions of service. DC SUN does not dispute the latter point, and we therefore have no occasion to address the point. Instead, DC SUN argues that § 34-909 (a) requires forty-five-day notice of all public hearings held by the Commission.

Considered in isolation, the last sentence of § 34-909 (a) supports DC SUN's position, because that sentence refers broadly to "every proceeding in which the Commission has a public hearing." It is well settled, however, that

> a word in a statute may or may not extend to the outer limits of its definitional possibilities. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. Therefore, we do not read statutory words in isolation; the language of surrounding and related paragraphs may be instrumental to understanding them. We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. Statutory interpretation is a holistic endeavor.

*Tippett v. Daly*, 10 A.3d 1123, 1127 (D.C. 2010) (en banc) (brackets, citations, ellipsis, and internal quotation marks omitted).

In concluding that the forty-five-day notice requirement is applicable only to rate cases and cases involving changes in conditions of service, the Commission pointed out that the rest of § 34-909 (a) addresses rate cases and cases in which there is a change in conditions of service. The Commission also noted that it had never before applied the notice requirement in a non-rate case. Finally, the Commission explained that this court held in *Office of People's Counsel v. Pub.*

*Serv. Comm'n*, 889 A.2d 1003, 1008 (D.C. 2006), that the notice-and-comment requirements of § 34-909 (a) did not apply to a non-rate case.[1]

We hold that the Commission reasonably interpreted the seemingly broad language in the last sentence of § 34-909 (a) as limited to rate cases and cases involving changes in conditions of service. *Cf., e.g.*, *Gutierrez v. Ada*, 528 U.S. 250, 254-58 (2000) (holding that phrase "any election" in 48 U.S.C. § 1422 should be construed narrowly to mean election for Governor and Lieutenant Governor; statute repeatedly referred to such elections, and "[a] word is known by the company it keeps[.]  The maxim *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.") (citation and

---

[1]  The Commission also noted that § 34-909's title refers to rate cases and cases involving changes in conditions of service.  That title, however, appears to have been added by codifiers rather than the Council of the District of Columbia. Act of Mar. 4, 1913, ch. 150, § 8, para. 39, 37 Stat. 983; 31 D.C. Reg. 6444 (1985); 32 D.C. Reg. 2961 (1985).  We therefore do not place weight on the title. *See, e.g.*, *United States v. Castro*, 837 F.2d 441, 442 n.1 (11th Cir. 1988) (title that "was added subsequent to enactment by those responsible for codification of the legislation . . . cannot therefore properly be of aid in determining the intent of Congress . . . .  Where headings of chapters, articles, or sections are mere arbitrary designations inserted for convenience of reference by clerks or other persons who have no legislative authority, such head[ing]s are held not to be proper matters for consideration in the interpretation of the statute.") (citations, parentheses, and internal quotation marks omitted).

internal quotation marks omitted).   We therefore defer to the Commission's conclusion that DC SUN was not entitled to forty-five days' notice of the hearings on the NSA.

DC SUN argues in the alternative that the notice provided by the Commission violated the District of Columbia Administrative Procedure Act (DC APA), which mandates "reasonable notice of the afforded hearing" in contested cases.  D.C. Code § 2-509 (a) (2016 Repl.).  Because no one has disputed the point, we assume without deciding that § 2-509 (a) applies to the present proceeding.  *Cf. Commc'n Workers of Am., Local 2336 v. District of Columbia Taxicab Comm'n*, 542 A.2d 1221, 1222-25 (D.C. 1988) (ratemaking proceeding before Taxicab Commission was not "contested case" within meaning of DC APA).

We conclude that the Commission provided reasonable public notice of the hearings relating to the NSA.  First, the Commission gave thirty-five days' notice for the public-interest hearing and twelve days' notice for the community hearing. Second, there was substantial public participation at the hearings on the NSA: over 250 residents, community groups, non-profits, and businesses registered to submit oral comments.   At least twelve witnesses presented live testimony, multiple parties submitted written testimony, and fourteen interested parties filed

twelve post-hearing initial briefs and nine reply briefs. Third, DC SUN gave a lengthy opening statement on the first day of the public-interest hearings on the NSA, appeared on the record at those hearings, and had the opportunity to cross-examine witnesses. Fourth, the Commission held the record open for thirty-four days after the hearings ended to allow for the submission of additional comments. During that time, DC SUN filed over ninety pages of briefing in opposition to the NSA. Fifth, at the time the Commission provided public notice, the Commission had already held extensive public hearings on the original merger application, with ample public notice. Sixth, over the course of the merger proceedings, the Commission held evidentiary hearings spanning fourteen days, convened six community hearings, and received written testimony and comments from over 3,000 interested persons. Finally, DC SUN has not identified any concrete point that could have been raised but was not because of inadequate notice of the hearings. Under the circumstances, we have no difficulty concluding that the Commission provided adequate public notice. *Cf. Comm. for Wash.'s Riverfront Parks v. Thompson*, 451 A.2d 1177, 1182, 1184 (D.C. 1982) (finding ten days' public notice of hearing reasonable).

## B. Rejection of the NSA

The District argues that the NSA considered as a whole was in the public interest and that the Commission lacked authority to require changes to the NSA to further advance the public interest. We conclude that the Commission's authority was not so limited.

Before approving the proposed merger, the Commission was required not only to determine that "said consolidation will be in the public interest," but also to "approve[] in writing the terms upon which said consolidation shall be made." D.C. Code § 34-504. More generally, "[i]n supervising and regulating utility or energy companies, the Commission shall consider the public safety, the economy of the District, the conservation of natural resources, and the preservation of environmental quality." D.C. Code § 34-808.02 (2017 Supp.); *cf.* D.C. Code § 34-301 (1)-(2) (2012 Repl.) (Commission has "general supervision" of electrical companies, including authority to issue orders with respect to transmission and distribution of electricity "as will reasonably promote the public interest[ and] preserve the public health"). These provisions contradict the District's suggestion that the Commission's function is limited to giving an overall "thumbs up" or "thumbs down" to a merger as proposed. Rather, they provide the Commission

with the authority to focus on particular terms of a proposed merger and to require specific changes to those terms to further advance the public interest. The District has cited no contrary authority and we are aware of none.

Relatedly, DC SUN argues that the Commission erred in "shoring up" the NSA by suggesting additional terms to the parties. We do not agree. The Commission's regulations explicitly allow the Commission to propose alternative terms after rejecting a settlement. 15 DCMR § 130.17 (b) (2017) ("If a settlement is rejected, the Commission may take various steps, including the following: . . . (b) [p]ropose alternative terms to the parties and allow the parties a reasonable time within which to elect to accept such terms or request other relief."). The Commission adequately explained its decision to take that approach in response to the NSA even though the Commission had not proposed alternative terms when presented with the original merger application. Specifically, the Commission explained that the "base of benefits [was] substantially higher" in the NSA than in the original application; that in crafting the NSA the settling parties had "endeavored to address all of the deficiencies in the original [a]pplication"; and that as a result "the changes needed to cure the remaining deficiencies were few[ and] clearly suggested by the evidentiary record."

## C. Applicants' Request for Other Relief

DC SUN and OPC argue that the Commission's procedures following the rejection of the NSA were unfair, contrary to law, and inadequately explained. We conclude otherwise.

After rejecting the initial application, the Commission reopened the record "for the very limited purpose of considering whether the [NSA] . . . is in the public interest," stating that the record would be reopened "for no other purpose." After rejecting the NSA, the Commission directed the settling parties to either accept the RNSA or request other relief pursuant to 15 DCMR § 130.17 (b). Applicants filed a unilateral request for other relief, asking the Commission to approve the merger in one of three forms based on the existing record. A subsequent email sent by Commission staff stated that applicants' request would be treated "like any other motion filed in a Commission proceeding." Petitioners all filed responses to the request, objecting on procedural and substantive grounds. None of the petitioners requested additional process in the event that the Commission chose to decide applicants' request on the merits.

DC SUN and OPC contend that they did not have an adequate opportunity to address concerns raised by the RNSA, because the Commission did not give them notice that it might grant applicants' request for other relief without further discovery or hearings. We see no unfairness in the Commission's decision to grant applicants' request for other relief without sua sponte directing further discovery and hearings. The Commission had already held extensive proceedings with respect to the initial application and the NSA; the RNSA differed from the NSA in only a few discrete respects; applicants' request for other relief explicitly asked for a ruling based on the existing record; and none of the petitioners asked for further process when opposing the request for other relief. Under the circumstances, we conclude that if petitioners believed that further discovery or hearings were necessary, they were obliged to bring that point to the Commission's attention before the Commission ruled on applicants' request. *See, e.g.*, *NLRB v. Mar Salle, Inc.*, 138 U.S. App. D.C. 135, 140 n.8, 425 F.2d 566, 571 n.8 (1970) (where party objected but failed to request hearing, Board did not err by failing to require hearing sua sponte); *cf. Wash. Gas Light Co. v. District of Columbia Pub. Serv. Comm'n*, 856 A.2d 1098, 1106-07 (D.C. 2004) (holding that Commission did not act arbitrarily in denying party's untimely request for evidentiary hearing).

DC SUN and OPC raise a number of other procedural objections to the Commission's acceptance of applicants' request for other relief. OPC argues that the request was a unilateral settlement agreement approved by the Commission in violation of D.C. Code § 2-509 (a) (providing that "any contested case may be disposed of by . . . *agreed* settlement") (emphasis added). OPC further argues that the Commission's action was prohibited by 15 DCMR § 130.17 (b), which OPC argues allows only for requests for relief submitted by all settling parties. DC SUN contends that the Commission's actions constituted either: (1) a partial acceptance and partial rejection of a non-severable settlement agreement in violation of 15 DCMR § 130.16, and a grant of an application for reconsideration that did not meet the requirements of 15 DCMR § 140 (2017); or (2) an approval of a new merger application that did not comport with proper procedures. We agree with the Commission that these procedural objections are not well-founded.

As the Commission reasonably explained, the Commission followed applicable procedural requirements in rejecting the NSA; treating applicants' request for other relief as a motion seeking approval of the merger on the merits; and deciding that motion on the merits after determining that doing so would be in the public interest. *See* 15 DCMR § 105.8 (2017) (written motions may be filed at any time); 15 DCMR § 130.17 (c) (if settlement is rejected, Commission may

"[p]roceed with litigation of the case"); *cf.* 15 DCMR § 146.1 (1981) (allowing Commission to waive regulations).

## D. Escrow Account

In approving the merger, the Commission required Exelon to place over $32 million into an escrow account, to be disbursed at the Commission's direction, to fund projects supporting energy efficiency, energy conservation, and modernization of the energy-delivery system. The District argues that this requirement violates the Clean and Affordable Energy Act of 2008 (CAEA), 55 D.C. Reg. 9225 (2008) (codified in scattered sections of D.C. Code Titles 6, 8, and 34), which the District construes as having "terminated the Commission's authority over such programs." The District also argues that the escrow fund violates the requirement that "[a]ll money received by any agency . . . of the District in its . . . official capacity shall belong to the District government and shall be paid promptly to the Mayor" for deposit into the District's General Fund or into special funds established by the Council. D.C. Code § 1-204.50 (2016 Repl.). We do not address these arguments, because the District failed to present them at any point during the proceedings before the Commission. *See, e.g.*, *Stackhouse v. District of Columbia Dep't of Emp't Servs.*, 111 A.3d 636, 639 (D.C. 2015) ("[I]n the absence

of exceptional circumstances, we will not entertain a claim that was not raised before the agency.") (internal quotation marks omitted).

We see no exceptional circumstances here. Although we express no view on their ultimate merit, the District's belated objections are neither clearly correct nor of the fundamental character that might justify disregarding the District's failure to raise those objections before the Commission. *See, e.g.*, *Wash. Gas Light Co.*, 982 A.2d at 700, 710 (court may consider argument not raised before agency where argument raises "an alleged defect in an agency's jurisdiction . . . so serious that it wholly deprives the agency of the power to act" or "concerns the very constitution of the agency") (brackets, ellipsis, and internal quotation marks omitted); *District of Columbia Hous. Auth. v. District of Columbia Office of Human Rights*, 881 A.2d 600, 612-13 (D.C. 2005) ("[T]his exception to waiver applies only where the challenge is to the agency's inherent capacity to act, or where the challenged action is plausibly claimed to be patently in excess of the agency's authority . . . . Otherwise, the general rule is that even jurisdictional questions must be put to agencies before they are brought to the reviewing court.") (brackets, citations, and internal quotation marks omitted).

## E.  General Adequacy of Explanation

The District and DC SUN argue that the Commission failed to fully and clearly explain its decision to approve the merger as revised.  We conclude to the contrary.

The proceedings before the Commission were extensive, and the Commission issued several orders, totaling over 330 pages, discussing at length the various proposals before it.  The Commission articulated the applicable public-interest standard several times and repeatedly applied that standard to the various terms under consideration.  The Commission also repeatedly stated that the burden of persuasion was on the proponents of the merger.  The Commission's final order approving the merger incorporated the Commission's earlier orders and included a lengthy recitation of the Commission's findings of fact and conclusions of law.

The District and DC SUN object that the Commission scattered its reasoning across multiple orders instead of providing a single order fully explaining the Commission's analysis.  They also contend that various statements in the Commission's orders demonstrate that the Commission (1) failed to independently determine whether the application as revised was in the public interest; and (2)

applied an incorrect burden of proof. We acknowledge that it is somewhat laborious to piece together the Commission's reasoning from the various orders. We also acknowledge that a few sentences in the Commission's orders, considered in isolation, could arguably be read to support petitioners' concerns. We are confident, however, that the Commission's orders taken as a whole demonstrate that the Commission applied the correct standard and adequately explained its decision. *Cf. D.C. Tel. Answering Serv. Comm. v. Pub. Serv. Comm'n*, 476 A.2d 1113, 1125 (D.C. 1984) ("[The Commission] was entitled to rely, as it apparently did here, on explanations contained in earlier orders."); *P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n*, 220 U.S. App. D.C. 13, 39, 678 F.2d 327, 353 (1982) (rejecting argument that agency misallocated burden of proof; "There is every indication throughout the Order that the [Commission] properly allocated the burden to the carriers. We are unswayed by arguments based on isolated sentences, viewed out of context . . . .").

## F. Other Specific Provisions

In addition to generally challenging the adequacy of the Commission's explanations, petitioners point to several specific provisions that they contend were

arbitrarily revised and approved without sufficient explanation. We conclude that the challenged decisions were reasonable and adequately explained.

First, petitioners challenge the Commission's revision of a term in the NSA providing for a $25.6 million offset to protect residential consumers from any rate increase, as well as a guarantee that no residential rate increase would occur before March 31, 2019. The merger as approved includes an offset in the same amount (and additional incremental offsets of up to $1 million per year) that could be used to offset subsequent rate increases for both residential and non-residential consumers, but does not include a guarantee that no residential rate increase would occur before March 31, 2019. The revision also leaves it to the Commission to determine in future ratemaking proceedings how the offset will be made and how to allocate the offset as between residential and non-residential consumers. In making these changes, the Commission reasonably explained that providing the offset exclusively to residential consumers would be unfair and unjustified. We see nothing unreasonable in the Commission's ultimate decision to leave for a later ratemaking proceeding decisions about how to allocate the offset as between residential and non-residential consumers and whether to permit a rate increase for residential consumers before March 31, 2019. *See, e.g.*, *GTE Serv. Corp. v. Fed. Commc'ns Comm'n*, 251 U.S. App. D.C. 181, 183, 191-92, 782 F.2d 263, 265,

273-74 (1986) (rejecting argument that FCC acted impermissibly by approving transfer of licenses and facilities but deferring questions about accounting of expenses to subsequent ratemaking proceedings; "Absent some unreasonable delay or significant prejudice to the parties, the Commission cannot be said to abuse its discretion merely by adopting procedures and timetables which it considers necessary to effective treatment of complex and difficult problems.").

Second, and relatedly, DC SUN points out that the Commission rejected the initial application in part out of concern about how applicants determined that $33.75 million was the appropriate amount for a Consumer Investment Fund (CIF) designed to provide direct benefits to consumers. Although that amount was increased to $72.8 million in the merger as approved, DC SUN accurately notes that the Commission never explained why it was satisfied as to the basis for that larger figure. As originally proposed, the CIF was based on anticipated savings to applicants arising from the merger (referred to as "synergy savings"), which the Commission acknowledged were not guaranteed. In approving the merger, the Commission relied upon applicants' commitment to track merger-related savings in subsequent ratemaking cases. The application as revised also provides that (1) Pepco may recover costs incurred in achieving synergy savings only to the extent those costs do not exceed the amount of synergy savings in an applicable year and

(2) all synergy savings allocable to the District will flow back to consumers. Thus, after initially expressing concerns about the underlying basis for the $33.75 million benefit to consumers, the Commission ultimately accepted a proposal that more than doubles that benefit and establishes protections to secure for District consumers the "synergy savings" from the merger that are properly allocable to the District. Here too we conclude that the Commission acted reasonably and adequately explained its decision.

Third, the District challenges the Commission's revision of a provision in the NSA requiring Exelon to develop ten megawatts of solar generation, five megawatts of which was to be constructed at DC Water Blue Plains. As approved, the merger instead requires Exelon to develop seven megawatts of solar generation outside of Blue Plains and requires Pepco to support the development of five megawatts of solar generation at Blue Plains by a vendor selected by DC Water. In making this change, the Commission reasonably explained that the original proposal gave Exelon the exclusive right to develop solar generation at Blue Plains, thereby compromising the Commission's statutory responsibility to protect retail markets from anticompetitive conduct and conditions. D.C. Code § 34-1512 (a) (2012 Repl.).

Finally, the District challenges the Commission's revision of provisions in the NSA requiring Exelon to contribute to special funds controlled by the District that support the expansion of renewable generation, energy efficiency, and sustainability. As previously noted, the merger as approved instead requires Exelon to place such funds into an escrow account to support energy efficiency programs, energy conservation, and modernization of the electrical grid, as the Commission directs. In making that change, the Commission explained that monies kept in special District-controlled funds could be "reprogrammed" by the District government and thus ultimately might not be devoted to the intended purposes. We have already addressed the District's claim that it was contrary to law to require Exelon to place the funds in an escrow account. *Supra* at 17-18. The District also argues, however, that the Commission unreasonably ignored the District's representations that it would oppose such reprogramming. The District has not disputed that it could not provide a binding assurance that the funds at issue would not be reprogrammed, as had happened in the past to similar funds. The Commission thus had reasonable policy grounds for instead requiring Exelon to place the funds at issue in an escrow account.

For the foregoing reasons, the Commission's order is

*Affirmed.*

FARRELL, *Senior Judge*, concurring: I join Judge McLeese's admirably concise opinion for the court, and write just to make two brief points. The first is the obvious one that if the D.C. Council, like the Executive, thinks the Commission overreached itself, *see* D.C. Code § 1-204.50 (2016 Repl.), by making Pepco set up an escrow fund under the supervision (and power to disburse monies) of the Commission, the Council has its own remedies. Second, I tip my hat -- and have little doubt my colleagues do also -- to the gruelingly conscientious work of the Commission in treating and resolving the issues in this case, one it recognized as importantly affecting the welfare of the District's residents going forward. The succession of detailed administrative orders and findings, especially those bearing the signature of Commissioner Fort, are of a clarity and quality any appellate judge could be proud of.