*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 21-AA-0684, 21-AA-0869

OFFICE OF THE PEOPLE'S COUNSEL FOR THE DISTRICT OF COLUMBIA, PETITIONER,

v.

D.C. PUBLIC SERVICE COMMISSION, RESPONDENT,

and

POTOMAC ELECTRIC POWER COMPANY, INTERVENOR.

On Petition for Review
of a Decision of the D.C. Public Service Commission
(Formal Case No. 1156)

(Argued September 15, 2022          Decided November 10, 2022)

*Scott H. Strauss*, with whom *Sandra Mattavous-Frye*, *Karen R. Sistrunk*, *Laurence C. Daniels*, and *Amanda C. Drennen* were on the brief, for petitioner.

*Kimberly Lincoln-Stewart*, with whom *Christopher G. Lipscombe*, *Angela L. Lee*, *Richard S. Herskovitz*, *Emil Hirsch*, *Emily Green*, *Frederick A. Douglas*, *Curtis A. Boykin*, and *Nausheen Gaznabi* were on the brief, for respondent.

*Nicholas S. Penn*, with whom *Anne Bancroft*, *Kimberly A. Curry*, *Andrea H. Harper*, *Dennis P. Jamouneau*, *Taylor W. Beckham*, and *Sherry F. Bellamy* were on the brief, for intervenor.

Before EASTERLY, MCLEESE, and HOWARD, *Associate Judges*.

EASTERLY, *Associate Judge*: The Office of the People's Counsel for the District of Columbia ("OPC") brings this challenge to two orders of the D.C. Public Service Commission ("the Commission") in *Formal Case No. 1156*, in which the Commission approved a multiyear rate plan for the Potomac Electric Power Company ("Pepco")'s electricity distribution services from 2020 to 2022. Specifically, OPC argues that the Commission should not have permitted Pepco to recover costs from its distribution customers that it incurred in conducting a remedial investigation and feasibility study regarding possible environmental damage at or from its facilities at 3400 Benning Road NE, Washington, D.C. ("the Benning Road site"). OPC also contests the inclusion of two energy efficiency rebate and loan programs targeting small businesses in Pepco's rate plan, which would permit Pepco to recover the costs of those programs from its customers in a future rate case.

We vacate the Commission's orders as to both issues and remand for further proceedings consistent with this opinion.

## I.     OPC's Challenge to Pepco's Recovery of Remedial Investigation Costs

### A.     Facts and Procedural History

Pepco's Benning Road site is a 77-acre lot bordered by the Anacostia River on its western side.  The site contains a service center used to support its transmission and distribution operations.  The site also contains a power plant that began operating in or around 1906, consisting of structures including a generating station, cooling towers, and storage facilities.  The generating station shut down in 2012.

In 1999, attempting to step back from its then-active energy production business, Pepco applied to the Commission in *Formal Case No. 945* for authorization to divest its generating assets according to its proposed plan.  The D.C. Council, however, had "concerns"—the exact nature of which is not clear from the record—about the proposed sale of two generating stations, including the one at Benning Road, and thus it requested that the Commission hold the divestiture in abeyance.  In order to move its divestiture application forward, and after engaging in "comprehensive negotiations," Pepco agreed to comply with specific conditions regarding those stations.  These conditions were memorialized in Section 1.05 of the resulting settlement agreement, hereinafter the "*FCN 945* Settlement," which provided:

> Nothing in this Settlement Agreement shall be construed as requiring Pepco to include in the sale of the [generating a]ssets, the Company's generating stations located at Benning Road and Buzzard Point in the District of Columbia; provided, however, that if the Benning Road and Buzzard Point generating stations are not included in the sale of the [generating a]ssets, the Company shall be thereafter barred and estopped from asserting or exercising any legal right that it might otherwise have to recover from customers located in the District of Columbia any stranded costs associated with those generating stations. In connection with any Pepco base rate proceeding in the District of Columbia instituted after June 30, 2000, the Benning Road and Buzzard Point generating stations shall not be included in the cost of service for purposes of determining the Company's District of Columbia jurisdictional revenue requirement.

The Commission approved this settlement agreement pursuant to its rules and procedures. *See* 15 D.C.M.R. § 130.13-.17 (2022).

Ten years later, the United States Environmental Protection Agency ("EPA") released a report detailing environmental toxins found on and around the Benning Road site. The report concluded that chemical contaminants known as PCBs[1] "have

---

[1] "PCBs" refers to polychlorinated biphenyls, a solid waste that persists in the environment without degrading; if a person consumes fish or other organisms that have been contaminated with PCBs from their environment, the PCBs can cause "a variety of adverse health effects, including cancer." Consent Decree at 2, *District of Columbia v. Potomac Elec. Power Co.*, No. 1:11-cv-00282-BAH (D.D.C. Aug. 17, 2011) [hereinafter "DOEE Consent Decree"], https://benningservicecenter.com/library/documents/BenningConsentDecree.pdf; https://perma.cc/WC6U-27WW.

been released from the site to the Anacostia River," tracing one release of PCBs to "the generating station's cooling tower basins," which discharge into the river. It further concluded that "[t]he only potential uncontained potential source [of PCBs] identified on the site" was a sludge dewatering area previously used in association with the cooling towers.

In response to the report, the District Department of Energy and Environment ("DOEE")[2] notified Pepco that it intended to sue the company for abatement of hazardous conditions resulting from the Benning Road site. To settle the intended suit, Pepco entered into a consent decree in 2011 with the DOEE, which in part bound Pepco to conduct a remedial investigation and feasibility study ("RI/FS") that would inform any future remedial actions.[3] As of the time of Pepco's application in this case, the company's work on the RI/FS was ongoing.

In 2018, Pepco entered into a settlement agreement to resolve its 2017 rate application, *Formal Case No. 1150*, before the Commission (hereinafter the "*FCN*

---

[2] At the time, the DOEE was known as the District Department of the Environment.

[3] DOEE Consent Decree at 6.

*1150* Settlement"). OPC was also a party to the settlement. Pepco had unsuccessfully sought to place its RI/FS costs in a "regulatory asset" in previous rate cases, but finally secured it in this settlement.[4] In relevant part, the *FCN 1150* Settlement provided:

> The Parties agree that Pepco will receive regulatory asset treatment in the total amount of $3.3 million in actual costs incurred to conduct a remedial investigation ("RI") at the Benning facility. Pepco will begin to recover the $3.3 million over a 10-year amortization period, with carrying costs based on the Company's Commission-authorized rate of return. This recovery relates only to the RI costs that have already been incurred as a result of the [DOEE] Consent Decree . . . and does not relate to, or have any precedential effect on, the recovery of additional RI costs incurred as a result of the [DOEE] Consent Decree. . . . Notwithstanding the foregoing provision, the Parties agree that all Parties retain the right to challenge in future rate cases Pepco's entitlement to any further recovery from ratepayers of this $3.3 million regulatory asset.

The Commission approved this settlement pursuant to its rules and procedures. *See* 15 D.C.M.R. § 130 (2022).

---

[4] As the Commission explained at oral argument, a "regulatory asset" is a "tracking mechanism" that enables examination of which of the company's costs were associated with a given item—here, the Benning Road RI/FS. As OPC explained in its reply brief, expenses recorded in a regulatory asset "are recognized as deferrals instead of period expenses" and are "deferred for potential future rate recovery."

In 2019, Pepco applied to the Commission for authority to establish its distribution rates for 2020 to 2022 through a multiyear rate plan, initiating *Formal Case No. 1156*. A multiyear rate plan is an alternative form of regulation that permits the utility to avoid the traditional annual rate application process. In its application, Pepco requested that the Commission approve recovery of a portion of its amortized RI/FS costs that were included in the regulatory asset established in the *FCN 1150* Settlement. Specifically, Pepco asked for permission to include approximately $1.9 million of its actual RI/FS costs incurred through December 31, 2017, in its calculation of the rates it would charge its distribution customers under the plan. It also requested similar recovery of its actual RI/FS costs incurred from January 1, 2018, through June 30, 2019, approximately totaling an additional $3 million.

The Commission received testimony and briefing from the various parties, including argument from OPC that Section 1.05 of the *FCN 945* Settlement barred recovery of any RI/FS costs from the Benning Road site. The Commission subsequently issued an order approving a modified version of Pepco's multiyear rate plan that reflected some concessions to objections raised by OPC and others, but granted Pepco's request to include in its rates the $1.9 million in pre-2018 RI/FS costs. After restating the relevant language from the *FCN 1150* Settlement, the Commission noted that "[a] review of the Company's request raises concerns about

the past uses of the site and how costs for the RI/FS . . . should be allocated among generation, transmission, and distribution, and ultimately the amount that should be recovered from District distribution customers." But the Commission went on to conclude that it was "persuaded by Pepco that the [RI/FS] costs were prudently incurred and are recoverable consistent with Commission precedent." Without further explanation or any reference to the *FCN 945* Settlement, the Commission stated that it would permit the recovery "as the costs were approved in *Formal Case No. 1150*." It then deferred Pepco's related request for recovery of RI/FS costs "incurred after those approved in *Formal Case No. 1150*" (referring to the post-December 31, 2017, costs), to be considered in a future rate case "once the Benning Road environmental costs and future use of the property [are] determined."

OPC filed a request for reconsideration of the Commission's order, challenging among other decisions the Commission's approval of the RI/FS cost recovery from distribution customers. The Commission issued a second order declining to reconsider its initial order, but stating it would provide "clarification" of aspects of that order. In this clarifying order, the Commission engaged for the first time with OPC's assertion that the *FCN 945* Settlement barred recovery of the RI/FS costs captured in the regulatory asset. It stated that it was "not persuaded by OPC's argument concerning the legal effect of [the *FCN 945*] Settlement

Agreement," which "on its face . . . did not bar recovery of Pepco's costs for future environmental remediation, only stranded costs and future operating costs." Because in its view the "plain language" of the *FCN 945* settlement agreement did not bar recovery, the Commission reaffirmed that it would allow recovery "because the costs were approved in *Formal Case No. 1150*."

This petition for review followed.[5]

---

[5] OPC filed two petitions for review, now consolidated: one of the initial order, filed after OPC requested reconsideration but before the Commission ruled on that request, and one of the subsequently issued clarifying order. The Commission asserts that this court lacks jurisdiction over the first petition because the initial order was not final at the time of filing, while OPC asserts that the Commission's failure to grant or deny reconsideration within 30 days rendered its order final by statute. *See* D.C. Code § 34-604(b). The Commission had instead issued a series of orders "tolling" its time to act on the request.

We need not decide whether the Commission, by its own orders, had the power to toll the 30-day deadline under D.C. Code § 34-604(b) to grant or deny reconsideration of its initial order. Even assuming that OPC's first petition was technically premature when filed, we have jurisdiction over both its petition for review of the Commission's initial order and its petition for review of the Commission's clarifying order because the former was final by the time this case was submitted for our consideration. *See West v. Morris*, 711 A.2d 1269, 1271 (D.C. 1998).

## B.   Analysis

The Commission did not engage with the possible effects of the *FCN 945* Settlement in its initial order, instead stating merely that the "costs were approved" already in the *FCN 1150* Settlement, and it repeated this rationale in its clarifying order.   Before this court, the Commission rightly concedes that the *FCN 1150* Settlement did not, as its orders indicated, guarantee full recovery of the costs allocated to the regulatory asset approved therein and instead permitted OPC to challenge recovery.   We therefore focus our analysis here on whether the Commission erred in concluding that the *FCN 945* Settlement posed no bar to recovery of the RI/FS costs because, by its "plain language," the *FCN 945* Settlement agreement applied only to stranded costs and "future operating costs."

Before we engage in this analysis, we address our standard of review. Broadly, our review of the Commission's orders is limited.   We defer to the Commission's "findings of fact . . . unless it shall appear that such findings are unreasonable, arbitrary, or capricious." *Apartment & Off. Bldg. Ass'n of Metro. Wash. v. Pub. Serv. Comm'n of D.C.*, 203 A.3d 772, 777 (D.C. 2019) (ellipsis omitted) (quoting D.C. Code § 34-606).   And we will affirm the Commission's orders "if there is substantial evidence to support [its] findings and conclusions and

the Commission has given reasoned consideration to each of the pertinent factors" under the circumstances. *Id.* (brackets and internal quotation marks omitted). In short, our deference is contingent on the Commission "fully and clearly explain[ing] what it does and why it does it." *Id.* (quoting *Potomac Elec. Power Co. v. Pub. Serv. Comm'n of D.C.*, 457 A.2d 776, 783-84 (D.C. 1983)); *accord Off. of the People's Couns. v. Pub. Serv. Comm'n of D.C.*, 163 A.3d 735, 739 (D.C. 2017) ("To permit meaningful judicial review, we require the Commission to explain its actions fully and clearly." (brackets omitted)).

Focusing more particularly on the *FCN 945* Settlement—the basis for OPC's challenge to the Commission's initial and clarifying orders—the Commission argues that we are obligated to defer to its reading of this agreement. The Commission relies on a decision from the United States Court of Appeals for the D.C. Circuit, *National Fuel Gas Supply Corp. v. Federal Energy Regulatory Commission*, which states that the D.C. Circuit will "give deference to an agency's reading of a settlement agreement even where the issue simply involves the proper construction of language." 811 F.2d 1563, 1569 (D.C. Cir. 1987). But this decision is not binding

on our court,[6] and under our case law, it is far from clear that this court defers to any degree to the Commission's interpretations of settlement agreements. *See Grand Hyatt Wash. v. D.C. Dep't of Emp. Servs.*, 963 A.2d 142, 146-47 (D.C. 2008) ("Settlement agreements . . . are contractual in nature and are interpreted under the same rules as contracts[,]" meaning "the written language will govern the parties' rights . . . ."); *Dyer v. Bilaal*, 983 A.2d 349, 355 (D.C. 2009) ("[W]e review *de novo* a trial court's interpretation of a settlement agreement."); *cf. D.C. Off. of Hum. Rts. v. D.C. Dep't of Corr.*, 40 A.3d 917, 923 (D.C. 2012) (noting that our standard deference to agency interpretation is "based on the agency's presumed expertise in construing the statute[s] it administers" (internal quotation marks omitted)). Even accepting for the sake of argument that deference to agency interpretation were warranted in this context, it would only be appropriate where there was ambiguous language and the agency's interpretation of that language was reasonable. *See MorphoTrust USA, Inc. v. D.C. Cont. Appeals Bd.*, 115 A.3d 571, 583 (D.C. 2015) ("In accordance with the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), before we afford some deference to an agency's interpretation of the statute that it administers at least two

---

[6] Although accorded respect, the decisions of the D.C. Circuit are only binding on this court up to February 1, 1971. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

conditions must be met: (1) the statutory language in question must be ambiguous, and (2) the agency's interpretation must be reasonable." (internal parallel citation omitted)). We thus turn to the plain language of the settlement to see if we discern ambiguity in its terms. *See D.C. Metro. Police Dep't v. Pinkard*, 801 A.2d 86, 90 (D.C. 2002).

The *FCN 945* Settlement states that in future base rate proceedings "the Benning Road and Buzzard Point generating stations shall not be included in the cost of service" to be passed on to its customers. The Commission read this to mean that "the Benning Road and Buzzard Point generating stations[' *future operating costs*] shall not be included in the cost of service." But this provision of the settlement agreement contains no language limiting its application as to time (i.e., costs incurred in the past, present, or future) or as to types of costs that can be attributed to the generating station (i.e., only operating costs). The Commission simply read in language that is not there. At oral argument before this court, the Commission conceded that the plain language of the *FCN 945* Settlement did not support its determination that the agreement only applied to future operating costs. The Commission is bound by the plain language of the agreement that the parties signed and it approved.

Even so, interpretive questions remain regarding the scope of the application of the *FCN 945* Settlement to the RI/FS costs at the Benning Road site. To the extent that the Commission is asking this court to conclude in the first instance that no RI/FS costs are actually attributable to the Benning Road generating station and thereby to uphold its determination that Pepco could pass on these costs to its distribution customers, we cannot do so. The exact scope of what costs may be attributed to the generating station is a complex and fact-intensive inquiry that cannot be answered on the record before us. For example, the basic question of how much of the 77-acre parcel of land at Benning Road was used for the generating station has yet to be addressed. The Commission seemed to acknowledge the complexity of these questions when it denied for the time being recovery of RI/FS costs incurred *after* the *FCN 1150* Settlement and expressed "concerns about the past uses of the site and how costs for the RI/FS . . . should be allocated among generation, transmission, and distribution, and ultimately the amount that should be recovered from District distribution customers." Now that the Commission concedes that the *FCN 1150* Settlement did not guarantee full recovery of the RI/FS costs discussed therein, see *supra*, the same concerns would presumably pertain.

We therefore vacate the Commission's order as to its approval of recovery of the Benning Road RI/FS costs and remand for the Commission to consider whether

the *FCN 945* Settlement bars recovery of some or all of those costs. On remand, the Commission must provide a reasoned interpretation of the scope of the agreement based on substantial evidence and set out why under its interpretation the RI/FS costs are or are not within the settlement's reach.

## II. OPC's Challenge to Inclusion of Energy Efficiency Programs in Pepco's Rate Plan for Future Recovery

### A. Facts and Procedural History

While Pepco's application in *Formal Case No. 1156* for a multiyear rate plan including the recovery of RI/FI costs discussed above was still pending, the Covid-19 pandemic broke out. In response, the Commission requested further testimony from the parties to *FCN 1156* reflecting the impact of the pandemic. Pepco submitted an "enhanced" plan that featured various revisions and, in pertinent part, proposed new energy efficiency rebate and loan ("EERL") programs primarily targeting its small commercial customers. Pepco asked the Commission to approve the programs, the $5 million cost of which Pepco could later recover, along with a return at the associated cost of capital,[7] via a regulatory asset in a future rate case.

---

[7] Pepco's proposed asset treatment included an additional return on the carried balance of the assets at a rate authorized by the Commission. In other words, if

The Commission's initial order approved Pepco's proposed EERL programs, stating that it was "persuaded [the programs] are reasonable and will provide needed relief to customers during the Covid-19 pandemic." In its request for reconsideration of the initial order, OPC challenged this decision, arguing that Pepco had failed to comply with a provision of the CleanEnergy DC Omnibus Amendment Act of 2018, which provides:

> As of October 1, 2019, the electric company . . . , after consultation and coordination with the Department of Energy and the Environment and the District [Sustainable Energy Utility ("SEU")] and its advisory board, may apply to the Commission to offer energy efficiency and demand reduction programs in the District that the company can demonstrate are not substantially similar to programs offered or in development by the SEU, unless the SEU supports such programs.

D.C. Code § 8-1774.07(g)(4).

In its clarifying order, the Commission rejected this argument on two primary grounds: (1) because "§ 8-1774.07(g)(4) does not contain the words 'shall' or 'must'" and "does not contain any sanctions or consequences for failing to

---

granted recovery of the asset, Pepco would recover an additional set percentage of the asset value from its customers on top of the base recovery. That additional profit is referred to as the cost of capital.

coordinate with the SEU," the statute was "directory" and not mandatory in nature, and (2) "Pepco made the determination that its program did not fall within the purview of this statute," which the Commission deemed "reasonable" because the "overall intent of these statutory provisions" was to apply to "*long-term* [energy efficiency] programs primarily aimed at low-to-moderate-income customers," not the short-term commercial programs proposed.[8]

This petition for review followed.

## B.     Analysis

Where, as here, we are confronted with questions of statutory interpretation, we look first to the plain language of the statute and, if that language is ambiguous, then and only then do we defer to the Commission's interpretation if reasonable. *Pinkard*, 801 A.2d at 90; *MorphoTrust USA, Inc.*, 115 A.3d at 583.   Section

---

[8] The Commission further concluded that it saw "no basis to conclude that Pepco violated the statute" absent a showing by OPC that the EERL program was duplicative of an SEU initiative, because the "overall intent" of § 8-1774.07 is "to prevent the duplication of [energy efficiency] and demand reduction programs that the SEU may be developing."  Finally, the Commission stated it was "reasonable and consistent with Commission precedent" for Pepco to place the costs of these programs in a recoverable regulatory asset because the programs were "in the public interest" and "help[] to address the District's climate change commitments."

8-1774.07(g)(4) of the D.C. Code provides that, "after consultation and coordination with" the DOEE and the DC SEU, an energy company like Pepco "may apply to the Commission to offer energy efficiency and demand reduction programs in the District." We conclude that the Commission erred in determining both that this statute did not apply to the EERL programs included in Pepco's multiyear rate plan and, even if it did apply, it did not require predicate steps by Pepco before including these programs in its application to the Commission.

We first address what programs fall within the scope of D.C. Code § 8-1774.07(g)(4). By its plain language, the statute applies broadly and unambiguously to "energy efficiency and demand reduction programs in the District." D.C. Code § 8-1774.07(g)(4). This unquestionably describes Pepco's proposed programs. The Commission's determination to the contrary appears to rely on language in § 8-1774.07(g)(5) suggesting that the Commission must consider whether an application will primarily benefit low- and moderate-income residential ratepayers.[9] But this language does not qualify the scope of § 8-1774.07(g)(4).

---

[9] D.C. Code § 8-1774.07(g)(5) provides that "[a]n application submitted by the electric company . . . pursuant to this subsection shall meet [1] the long-term and annual energy savings metrics, which shall primarily benefit low- and moderate-income residential ratepayers to the extent possible, [2] quantitative performance indicators, and [3] cost-effective standards established by the Commission."

Section 8-1774.07(g)(5) discusses what factors the Commission should consider when evaluating the merits of an application it has already received. The consultation-with-the-DOEE-and-SEU provision in § 8-1774.07(g)(4) outlines a step the company must take *before* submitting an application.

Moreover, the Commission's interpretation of D.C. § 8-1774.07(g)(4) is at odds with the District's broader energy goals that underlie the statute and the administrative structure the District has established to pursue those goals. The Council for the District of Columbia created the SEU in the Clean and Affordable Energy Act of 2008, D.C. Act 17-497, 55 D.C. Reg. 9225 (Oct. 22, 2008). The SEU's express purpose is "to develop, *coordinate*, and provide programs for the purpose of promoting the sustainable use of energy in the District of Columbia." D.C. Code § 8-1773.01(19) (emphasis added). Indeed, the legislative history of the SEU's establishment reveals that the Council was motivated to create such a utility because Pepco and the Commission's collective efforts to coordinate energy programs without further oversight were "not adequate" and "plainly [did] not work." Report on Bill No. 17-492 before the Committee on Public Services and Consumer Affairs, Council of the District of Columbia, at 8-9, 12-13 (June 2, 2008). And the District added the specific language in subsection (g) to "clarif[y] that *any* energy efficiency or demand reduction program *must be created in consultation* with

the Department of Energy and the Environment and the Sustainable Energy Utility and its advisory board." Amendment No. 1 to Bill No. 22-0904, D.C. Council, at 2 (Nov. 27, 2018) (emphasis added). It would be irrational and counterproductive to carve out short-term programs targeting small business consumers from this administrative structure when District-wide coordination of "any" energy efficiency program is the statute's manifest goal.

Having determined that the proposed programs fall within the statute's ambit, we further conclude that the consultation-with-the-DOEE-and-SEU provision in § 8-1774.07(g)(4) is mandatory by its plain language. Contrary to the Commission's reasoning in its clarifying order, a statute need not contain the exact words "shall" or "must" in order to be mandatory. Here, the grammatical construction of the sentence leaves no room for Pepco to act at its discretion. To say an "electric company . . . , after consultation and coordination with the Department of Energy and the Environment and the District SEU and its advisory board, may apply to the Commission" means that that electric company "may not before such consultation apply to the Commission." The Commission's focus on the lack of express penalty was also misguided; as OPC correctly pointed out, the denial of any application submitted without the required consultation and coordination is sufficient consequence in itself.

In its brief to this court, the Commission takes a new approach and appears to argue that pursuant to its broad ratemaking authority under D.C. Code § 34-1504(d)(1) ("*Notwithstanding any other provision of law*, the Commission may regulate the regulated services of the electric company through alternative forms of regulation" (emphasis added)), it has the power to waive the consultation-with-the-DOEE-and-SEU requirement.  We cannot agree.

We note at the outset that, because the Commission did not articulate the ability to grant such waivers as one of its stated grounds for granting Pepco's request, we cannot affirm on this basis.  *Walsh v. D.C. Bd. of Appeals & Rev.*, 826 A.2d 375, 380 (D.C. 2003) ("An administrative order can only be sustained on the grounds relied on by the agency, and not on agency counsel's *post hoc* rationalizations." (cleaned up)).  Furthermore, taking this argument at face value would yield absurd results.[10]  Whatever the exact boundaries of the Commission's authority under § 34-1504(d)(1), we need not define them in this case because §§ 8-1774.07(g)(4) and 34-1504(d)(1) "can be harmonized and deemed to have concurrent operation," *Stevens v. D.C. Dep't of Health*, 150 A.3d 307, 316 (D.C. 2016) (internal quotation

---

[10] As the Commission conceded at oral argument, the Commission could not, for example, discriminate freely in disregard of the Human Rights Act so long as it did so while establishing an alternative form of regulation.

marks omitted), alleviating any need to curb one for the benefit of the other.  Section 8-1774.07(g)(4) imposes a consultation requirement on Pepco *prior to* its application to the Commission; once an application has been properly presented to the Commission, the Commission retains its full regulatory authority over that application.

Because Pepco was required by § 8-1774.07(g)(4) to consult with the DOEE and DC SEU prior to its application but the Commission granted its application in the absence of any evidence that Pepco complied with this prerequisite, we vacate the Commission's order as to its approval of Pepco's EERL programs.[11]

### III.   Conclusion

For the foregoing reasons, we vacate the Commission's orders in relevant part and remand for further proceedings consistent with this opinion.

*So ordered*.

---

[11] We therefore do not reach the parties' arguments regarding the Commission's substantive assessment, see *supra* note 8, of whether the EERL programs would be duplicative of other SEU initiatives, or whether the programs meet the District's climate change goals and serve the public interest.